Ruhl, Admrx., *v.* Philadelphia et al., Appellants.

Argued November 30, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*John J. K. Caskie,* with him *James F. Ryan,* Assistant City Solicitors, and *Ernest Lowengrund,* Acting City Solicitor, for appellant No. 262.

*Arthur Littleton,* with him *Ernest R. von Starck* and *Morgan, Lewis & Bockius,* for appellant No. 265.

*John B. H. Carter,* with him *Paul Maloney* and *Benjamin O. Frick,* for appellee.

Opinion by Mr. Justice Maxey,* January 4, 1943:

These are appeals from the refusal of the court below to grant the motions of the City of Philadelphia and The Philadelphia Gas Works Company for judgments n. o. v. and for new trials. Alice A. Ruhl, administratrix of the estate of Frank M. Ruhl, brought an action in trespass against the City of Philadelphia and The Philadelphia Gas Works Company, to recover damages for the death of her husband Frank M. Ruhl. Verdicts were returned in favor of the plaintiff against both defendants in the sum of $17,892.65. Both the City of Philadelphia and The Philadelphia Gas Works Company appealed. Frank M. Ruhl was fifty-six years of age and for fifteen years before his death had been a fireman of The Fire Insurance Patrol of the City of Philadelphia. On February 11, 1941, there were three explosions of illuminating gas on Greenwich Street in South Philadelphia, in the middle of the 1100 Block. This block runs generally in an east and west direction from Passyunk Avenue to Dickinson Street. It is approximately 300 feet long. The cartway is 14 feet wide, the footways are 8 feet wide. The houses have frontages of 15 feet 6 inches and 16 feet.

At about 5 A. M. on the date mentioned there was an explosion within the premises 1112-1114 on the south side of the street. Fifteen minutes later there was a second explosion, which killed Mr. Ruhl while he was standing on the abutting sidewalk within the premises 1105-1107 on the north side of the street. About 8:35 A. M. there was a third explosion under the cartway between the two premises just named. As a result of these explosions a section of the cartway between the wrecked premises was blown out. A "V" shaped cavity was created about 37½ feet long, 13 feet wide, 6⅓ feet deep at the eastern end and 3 feet deep at the western end. After the debris was cleared out of this cavity, the gas mains and sewer were found to be broken.

---

* Mr. Justice Maxey became Chief Justice on January 4, 1943, after this opinion was filed.

The fire insurance patrol arrived at the scene of the first explosion about 5:07 A. M. at which time the premises, 1112-1114, were filled with flames. The fronts of the buildings had been blown out across the cartway. The Lieutenant in charge testified that he "told the men that there was no work for us to do there, to go on the other side of the street and remain there until further orders". They did so. The Lieutenant considered that side of the street "perfectly safe". The deceased remained on the side of the street where he had gone pursuant to his superior's direction. That was in front of Nos. 1105-1107. The fire was on the opposite side. The Lieutenant then went to Dickinson Street where the patrol truck was parked and he did not return until after the second explosion. Some people saw flames coming from the burning buildings. The debris was burning in the cartway and gas was flaming from the vent boxes on the sidewalk near where Ruhl was standing. A person overcome by gas was being carried out of the front door of 1107. There is no proof that Ruhl saw this or that he detected the odor of gas or saw gas flames.

The gas company was in exclusive possession and control of its gas and gas mains. For two years the neighbors had smelled escaping gas and had notified the gas company. The last notification was three days before the explosions. The gas company did not try to locate the leak. It did not repair its leaking main or shut off the gas. The City of Philadelphia was at work in the 1100 block of Greenwich Street from January 10, 1940, until August 21, 1940. There was some testimony that it made repairs of a minor character as late as October 1940. The principal repair was of a wash-out and cave-in caused by a water main break late in February 1940, which required an extensive excavation in front of 1103-1107 Greenwich Street. This work and all other repairs were completed in the regular course. The excavations were backfilled, tamped, made level with the surface of the highway and permanently repaved by the asphalt

division of the city. There was one slight depression in the surface of the highway in front of 1102-1104, reported in January 1941, which did not warrant any repairs. There were no observable defects and plaintiff's neighborhood witnesses testified that after the repairs were completed the water service was perfect until the explosions occurred. Plaintiff's expert witnesses testified that sometime after midnight on the morning of the explosions the gas company's pipe which was corroded and leaking for years, for a cause unknown, suddenly and completely ruptured and that gas flowed into the basements of 1112-1114, condensed into an explosive mixture and was ignited by the heater. The two other explosions followed.

There is no evidence by actual observers of the existence of any cavity in the earth underneath the gas pipes or adjacent thereto prior to the explosions. Expert witnesses were offered in order to supply the lack of this direct, visual evidence.

In this case the gas company takes the position that the gas main was undermined by subterranean water leaks which should have been discovered and corrected by the City. Three leaks in the water main occurred in this area, within 65 feet, in 5 months. City witnesses admitted this was an unusual and extraordinary condition. One of these breaks washed water and clay into the cellar of 1105 and undermined its foundations. Another created a cavity, about 25 feet square and 4 feet deep, east of the explosion cavity and almost but not quite contiguous with it. There is evidence that these breaks were repaired singly and that no overall inspection was made to determine the underlying cause of all of them. Mr. Newsom, an expert called by the Gas Works Company, said this should have been done. A witness, Rinaldi, said that he had water in his cellar at 1102 in October, 1940, but he does not say that he complained of it. Two of the broken pieces of pipe which were removed after the explosions were so discolored as to indicate that they were not fresh breaks but had existed for some time. One of

the joints in the water main was pulled from position and there was discoloration on the pipe as though water had long run over it. Two empty ferrule holes were found in the water main. Part of the threads from a screw ferrule were in one and the other was a smooth hole for a driven ferrule. No ferrules were found to fit these holes, and no plugs.

Mr. Newson, the expert, testified that he believed the hole in the sewer was older than the explosions and that the great amount of dirt found in it had been washed there over a period of time.

The Water Bureau of Philadelphia received between February 22, 1940, and January 1, 1941, approximately a score of complaints about leaks in the water mains in Greenwich Street and these complaints were followed by repairs. There was also a break in the sewer pipes "adjacent to lateral connection of No. 1105" Greenwich Street on February 24, 1940, and there was a repair of the sewer line at the same spot on April 17, 1940.

It is the contention of the plaintiff that both the defendants were negligent. It is the contention of the defendant Gas Company that the defendant City was negligent in that it failed to take the usual "and customary precautions after notice to it that there were sub-surface conditions which were operating upon its water main so as to weaken it, and in that it failed to inspect its main for defects which might arise therein as a natural result of the three complete breaks in a short space of time and within a short distance".

It is the contention of the defendant City that "the sole proximate cause of plaintiff's injury, except for the action and inaction of deceased, is the negligence of the gas company in exclusive possession and control of its gas and gas mains, in permitting its gas to escape after it had ample notice that it was escaping, in failing to repair the leak or to shut off the gas, and in continuing to force gas into the leaking mains until the explosions occurred".

The Gas Company earnestly contends that it was entitled to judgment n. o. v. for the reason that precise measurements produced by it demonstrates that there was no leak in the service connecting the premises 1112. Counsel for the Gas Company say in their brief of argument: "It is obvious from the Statement of Facts that the verdict of the jury against the defendant Gas Company can be supported only on the assumption that they believed and found that a hole had existed in the wall of the nipple of the service pipe to premises 1112 Greenwich Street at the time of the explosion and for some time prior thereto. If no hole existed in that service connection from which gas was leaking there was no proof of negligence on the part of the defendant Gas Company, since there is no testimony or evidence indicating any other place from which gas could have escaped. . . . the service pipe terminated in a wrought iron nipple, one end of which was screwed into a 'T' forming a part of the service pipe and the other end of which was screwed into the main. The portion of the nipple that was left in the service pipe after the nipple broke was a part of an Exhibit in the case, as was the section of the main containing the other portion of the nipple. Thus, there were present for inspection and examination by all parties in interest, the physical evidence upon which the plaintiff's case was based. Despite this fact, all of the testimony that was produced by the plaintiff concerning the size and shape of these two pieces of the nipple, including the testimony of the defendant City's Chemist, was opinion amounting only to rough estimates and guesses. It is obvious that if a pipe is broken but the pieces into which the pipe have been broken are present, it can be determined conclusively, by precise measurement of those pieces, whether or not any of the metal of that pipe is or was missing. Despite the existence of this accurate and obvious method of determining the physical fact in issue, not one of the experts called to testify against the defendant Gas Company made such measurements."

In support of the position it thus takes, the Gas Company invokes the case of *Wright v. Pittsburgh Rys. Co. et al.*, 320 Pa. 40, 181 A. 476, holding that where, in a negligence case, measurements are material, and such measurements could have been made by plaintiff, uncertain or conjectural estimates made by witnesses on behalf of plaintiff cannot prevail over actual measurements produced by defendant. As to the contention made by the Gas Company, Judge Bok in his opinion denying the motions for judgments n. o. v. and for new trials pointed out that "it is not admitted that the whole length of the nipple-joint exists", that one exhibit shows part of it and some of it is in another exhibit. His opinion further states: "Defendant says all of the remainder is in P-20 and seeks to prove it by photographs and measurements, saying also that it must be apparent even to a casual observer that all of the nipple's perimeter is in P-20. If so, the jury must be the casual observer, since the plaintiff's experts said that not all of the perimeter of the nipple was in P-20." We agree with the court below as to this and in holding that the evidence of the negligence of both defendants was such as to make this a case for the jury.

It is also contended by the defendants that plaintiff's decedent had assumed the risk of the danger which resulted in his death or that he was contributorily negligent as a matter of law. As a patrolman of the Fire Insurance Patrol, the deceased had the authority to enter burning buildings to protect life and property. This patrol is maintained by voluntary contributions from insurance companies. See *Boyd v. Fire Insurance Patrol*, 113 Pa. 269, 6 A. 536.

As above stated, Ruhl was when he was killed in the place he was ordered to go and which was considered by his superior officer as safe. On this phase of the case the court below aptly says: "It is what a fireman is doing at the time he is hurt that matters, not the mere fact that he is a fireman. In *Drake v. Fenton*, 237 Pa. 8 [85 A. 14],

a fireman on duty inside a burning building was allowed to recover because he fell down an elevator shaft that was unguarded, contrary to law. See also *Fry v. Brubaker,* 77 Pa. Superior Ct. 438 (1921), and *Dillon v. Light Co.,* 179 Pa. 482 [36 A. 164]. It is one thing to say that a fireman who has gone into a danger zone must take what he gets, and quite another to say that a person who stops short of the danger zone cannot recover because he is a fireman."

4 Thompson on Negligence, sec. 4618, lays down this principle, which is abundantly sustained by the authorities: "The servant does not accept the risk of dangers proceeding from the special or unforeseen negligence of the master, or of those for whose conduct the master is responsible, or of the negligences of the master which are unknown to him, such dangers not being ordinarily incident to the business." See also 39 C. J. sec. 882, p. 684. It clearly cannot be said as a matter of law that the decedent as a fire patrolman assumed the risk of being killed in a gas explosion which resulted from the fire he officially attended. Such a risk was not ordinarily incident to the discharge of his duties nor did he have any actual or constructive knowledge of it with full appreciation of the special dangers confronting him. There is no proof that Ruhl smelled gas before the second explosion or that he had any reason to apprehend a second explosion of gas.. There is proof that some of his fellow patrolmen smelled no gas. Ruhl had been at the scene less than ten minutes. He went there to perform his duty. It was for the jury to say whether Ruhl showed want of care under the circumstances.

As to Ruhl's alleged contributory negligence the presumption is, since he was killed, that he used due care and there is no evidence rebutting this presumption so conclusively that he can be declared guilty of negligence as a matter of law. See *Penna. R. R. Co. v. Weiss,* 87 Pa. 447.

Complaint is made of the trial judge's instructions to the jury as to the respective duties of the two defendants. The alleged errors in this phase of the trial are fully discussed by the learned court below in its opinion and it is unnecessary for us to add to what was therein said. The instructions were in harmony with what was said in *Koelsch v. Phila. Co.*, 152 Pa. 355, 25 A. 522, and *Schwindt v. Lehigh Water Company*, 33 Pa. Superior Ct. 23. We find no error in the instructions of the trial judge or on any other phase of the case.

We agree with the court below that "there is ample evidence to warrant the joint verdict . . . Each defendant tried to lay the blame upon the other . . . , and each succeeded against the other", and, as the court said: "the plaintiff benefited".

The judgment is affirmed.